## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) THE ESTATE OF CLAYTON LOCKETT,
by and through its personal representative
GARY LOCKETT,

          Plaintiff,

v.

(1) GOVERNOR MARY FALLIN, in her
individual capacity;
(2) ROBERT C. PATTON, in his individual
capacity;
(3) ANITA K. TRAMMELL, in her individual
capacity; *et al.,*

          Defendants.

**Case No: CIV-14-1119-HE**

## <u>RESPONSE TO MOTION TO STRIKE COMPLAINT</u>

Plaintiff, the Estate of Clayton Lockett, by and through counsel David A. Lane,

Kathryn Stimson and Mark Henricksen hereby files the following RESPONSE TO

MOTION TO STRIKE COMPLAINT:

### I.  The Oklahoma Secrecy Statute is Unconstitutional

OKLA. STAT. title. 22, § 1015(B) states that "The identity of all persons who

participate in or administer the execution process and persons who supply the drugs,

medical supplies or medical equipment for the execution shall be confidential and shall

not be subject to discovery in any civil or criminal proceedings."

In his motion to strike, the Attorney General has alleged that undersigned

counsel's naming of the doctor who engaged in the torture killing of Clayton Lockett

"was an intentional violation of the confidentiality provisions of [the statute] and was

designed strictly to harass and oppress persons believed to be involved in the execution

process in Oklahoma."[1]  The truth however, is quite the opposite.  Naming the doctor who violated the Constitution of the United States in a civil rights complaint brought in federal court is not designed to "harass" or "oppress" anyone; it is simply designed to hail into the dock a civil rights violating doctor who tortured and killed a human being in violation of the Constitution and is in compliance with the mandate of F.R.Civ.P. 10. Quite plainly, under the First Amendment to the United States Constitution, the State of Oklahoma has no power, right or ability to stop undersigned counsel from shouting the names of all involved in the torture killing of Clayton Lockett from the highest mountain tops if they so desire.

### A.  The Confidentiality Statute is an Unconstitutional Prior Restraint of Free Speech.

Freedom of expression upon matters of public concern is secured by the First Amendment. *Bartnicki v. Vopper*, 532 U.S. 514, 534-35 (2001) (citing *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 269 (1964)). Any system of prior restraints of expression bears a heavy presumption against its constitutional validity. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419-20 (1971) (citing *Carroll* v. *Princess Anne*, 393 U.S. 175, 181 (1968); *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 70 (1963). The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *Id.* In *Keefe*, the court held that no prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419-20 (1971).

---

[1] Attributing unlawful motives to opposing counsel, while threatening Rule 11 sanctions is at best hyperbolic and at worst an *ad hominem* attack.  Neither lends itself to any sense of professionalism.

In this case, members of the execution team, including the already-named doctor had all volunteered to kill Clayton Lockett. No one forced any of them to kill Mr. Lockett and if they now find themselves on the receiving end of a civil rights lawsuit, that consequence is one of the downsides of the mission they signed up for when they undertook their tasks. They were employed by the State of Oklahoma to kill Mr. Lockett humanely and they failed in that assignment. They were paid for their efforts. They appeared without masks in the execution chamber and subjected themselves to identification by anyone who happened to view their faces and recognized them. While acting under color of State law they also subjected themselves to the jurisdiction of this Court if they violated the Constitution of the United States, which they did.

Who these people are and what they did are clearly matters of great public concern. Whether they were trained or qualified to attempt to kill Clayton Lockett forms part of the subject matter of this litigation. "The right of privacy does not prohibit any publication of matter which is of public or general interest." *Bartnicki v. Vopper*, 532 U.S. 514, 534 (2001) (citation omitted). One of the costs associated with participation in public affairs is an attendant loss of privacy. *Id.* If a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order. *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 103-04 (1979). If the information is lawfully obtained, the state may not punish its publication except when necessary to further a substantial interest. *Id.*

The Court has interpreted First Amendment guarantees to afford special protection against orders that prohibit the publication or broadcast of particular

information or commentary - orders that impose a "previous" or "prior" restraint on speech. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 556 (1976). Prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. *Id.* A prior restraint has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint "freezes" it at least for the time. *Id.* The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events. Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment. *Id.* (*citing Cox Broadcasting Corp v. Cohn*, 420 U.S. 469, 492-493 (1975); *Craig v. Harney*, 331 U.S. 367, 374 (1947)). The protection against prior restraint should have particular force as applied to reporting of criminal proceedings, whether the crime in question is a single isolated act or a pattern of criminal conduct. *Id.*

Naming purported constitutional violators employed by the State of Oklahoma to kill prisoners is "…speech critical of the exercise of the State's power [which] lies at the very center of the First Amendment. [The State] seeks to punish the dissemination of information relating to alleged governmental misconduct, which only last Term we described as "speech which has traditionally been recognized as lying at the core of the First Amendment." *Butterworth* v. *Smith*, 494 U.S. 624, 632 (1990).

The Court has been particularly attuned to encroachments upon free speech relating to the operating of the criminal justice system.  This is because the judicial system "play[s] a vital part in a democratic state, and the public has a legitimate interest in their operations. See, *e. g., Landmark Communications, Inc.* v. *Virginia*, 435 U.S. 829,

838-839 (1978). "It would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555, 575 (1980). Public vigilance serves us well, for "the knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power. . . . Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *In re Oliver*, 333 U.S. 257, 270-271 (1948)." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034-35 (1991).

Even when national security is invoked by the government in support of censorship, the Court has unambiguously held that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc*. v. *Sullivan*, 372 U.S. 58, 70 (1963); see also *Near* v. *Minnesota*, 283 U.S. 697 (1931). The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin* v. *Keefe*, 402 U.S. 415, 419 (1971)." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971).  While the national security context is where prior restraints stand their best chance of being upheld, even under those situations the Courts are not deferential simply because the magic words "national security" have been invoked by the government.

Under strict scrutiny review, the Government must demonstrate that the nondisclosure requirement is "narrowly tailored to promote a compelling Government interest," *Playboy Entertainment*, 529 U.S. at 813, and that there are no "less restrictive alternatives [that] would be at least as effective in achieving the legitimate purpose that

the statute was enacted to serve," *Reno v. ACLU*, 521 U.S. 844, 874 (1997)." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 878 (2d Cir. 2008). This undertaking will require an evidentiary hearing.

### B.  The Secrecy Statute is Unconstitutional Under the First Amendment as its Application Would Deny Plaintiff the Right To Petition The Government For Redress of Grievances.

In *California Motor Transport Co* . v. *Trucking Unlimited*, 404 U.S. 508, 510 (1972), the Court recognized the right of access to the courts is a critical component of the First Amendment right to petition the Government for redress of grievances. *See also Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 741 (1983) ("[Going] to a judicial body for redress of alleged wrongs . . . stands apart from other forms of action directed at the alleged wrongdoer. The right of access to a court is too important…"

Plaintiff has named John Doe Defendants in this case because Plaintiff does not know the identities of the John Doe Defendants at this point.  Ultimately, this Court must Order the Defendants to disclose the names of everyone named as a John Doe in the Complaint as to deny Plaintiff's soon-to-be-served discovery request would be to permit an Oklahoma state statute to confer immunity on wrongdoing state actors from liability under a federal § 1983 claim. Plaintiff would have no way to invoke his right to petition the government for redress of grievances because the State would never have to divulge the names of it's wrongdoing employees or agents, all of whom were acting under color of state law when they combined forces to torture Clayton Lockett to death.

Federal courts have repeatedly struck down state efforts to immunize their wrongdoers from being held accountable under § 1983.  To prevail on an "access to the courts" constitutional challenge, a litigant must demonstrate "actual injury - that is 'actual

prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim.'" *Lewis v. Casey*, 518 U.S. 343, 348 (1996).  Here, the actual injury has already occurred – Clayton Lockett was brutally killed by the defendants in violation of the Eighth Amendment to the Constitution.  It is now time for the wrongdoers to be held accountable for their actions as set forth in the Complaint.  Absent knowledge of the names of the John Doe defendants, the state has effectively immunized these defendants and evaded the jurisdiction of this Court.  "It is the role of courts to provide relief to claimants…who have suffered…actual harm." *Lewis*, 518 U.S. at 349.  *Lewis* echoed the prior holding in *Bounds v. Smith* 430 U.S. 817 (1977) in which the Court acknowledged the fundamental right of access to the courts.  The Court has routinely struck down state-created obstacles imposed upon indigent prisoners which served to bar them from the courthouse doors. The Court has prohibited state prison officials from actively interfering with inmates' attempts to prepare legal documents, *e. g., Johnson* v. *Avery*, 393 U.S. 483, 484, 489-490 (1969), or file them, *e. g., Ex parte Hull*, 312 U.S. 546, 547-549 (1941), and by requiring state courts to waive filing fees, *e. g., Burns* v. *Ohio*, 360 U.S. 252, 258 (1959), or transcript fees, *e. g., Griffin* v. *Illinois*, 351 U.S. 12, 19 (1956), for indigent inmates. *Bounds* focused on the same entitlement of access to the courts.  *See Lewis* 518 U.S. at 350; (*See also Whitington v. Ortiz*, 307 F. App'x 179, 187 (10th Cir. 2009) (inmates are entitled to tools to vindicate their constitutional right to access the courts for the purpose of pursuing post-conviction and habeas relief claims, and, to a more limited extent, civil rights claims)).

State efforts to immunize their employees from § 1983 liability have been resoundingly and consistently struck down by the United States Supreme Court.  "[T]he

central purpose of the Reconstruction-Era laws is to provide compensatory relief to those deprived of their federal rights by state actors. Section 1983 accomplishes this goal by creating a form of liability that, by its very nature, runs only against a specific class of defendants: government bodies and their officials. Wisconsin's notice-of-claim statute undermines this "uniquely federal remedy," *Felder v. Casey*, 487 U.S. 131, 141-42 (1988).  The Court went on to hold that enforcement of the state statute in § 1983 actions "so interferes with and frustrates the substantive right Congress created that, under the Supremacy Clause, it must yield to the federal interest." *Id.* at 151.

The secrecy statute in Oklahoma is yet another effort by the State to thwart the reach of § 1983 and to erect a state barrier to the vindication of federal rights.  Just as every other state-erected barrier to the vindication of federal civil rights in federal court has fallen, so too must the State secrecy law.

**II.  No Court Has Addressed The Constitutionality of Secrecy Laws After A Cognizable Injury Has Occurred.**

Although undersigned counsel is loath to admit that there is any issue regarding any legal issue which a court somewhere has never addressed, the issue of the constitutionality of a secrecy law being litigated *after* a cognizable injury has occurred appears to be something new under the legal sun.  Contrary to the erroneous assertions of the State, *no court anywhere* has addressed the constitutionality of secrecy laws except in context of death row inmates seeking to identify the drugs to be used in killing them, as well as the makers of those drugs and the identities of the members of the execution teams who will participate in their future executions.  Courts have uniformly held that condemned prisoners certainly have a right to know what drugs will be used to kill them, but beyond that any information identifying the execution team or the maker of the drugs

is irrelevant to any claim they may raise regarding a prospective Eighth Amendment violation. Courts have repeatedly held that the condemned inmates lack standing to obtain this information as no actual harm has befallen them and any future harm would be purely speculative thus the identities of the execution team or drug manufacturers has been deemed irrelevant. *See In re Lombardi,* 741 F.3d 888, 897 (8th Cir. 2014).

The State attempts to convince this Court that the Oklahoma secrecy statute was upheld in two cases filed by Clayton Lockett prior to his execution. This is simply untrue and absolutely misleading. The Court in *Lockett v. Evans,* 330 P.3d 488, 491 (Okla. 2014) never addressed the constitutionality of the secrecy statute. The case merely says that the court below went too far in declaring the statute unconstitutional as all Mr. Lockett needed to know in order to vindicate his rights under the Constitution was what drugs he was going to be killed with and that information was provided to him. The Court never addressed the constitutionality of the confidentiality statute. Similarly, in *Lockett v. State*, 329 P.3d 755 (Okla. Crim. App. 2014) the Court again simply noted that Mr. Lockett had access to information regarding the drugs the State would attempt to kill him with, therefore the other information sought regarding the identities of the drug manufacturers or execution team members was unnecessary to achieve adequate access to the courts. Contrary to the false assertion by the State, neither court addressed the constitutionality of the secrecy statute.

This Court will be the first court in the United States to deal with a secrecy statute *after* a cognizable injury has been alleged. To uphold the secrecy statute would be to violate the First Amendment's guaranty of the right to petition the government for redress

of grievances and would immunize wrong doing State actors from any federal consequences for their unlawful conduct.

### III.  The Defendants Should Not Be Permitted To Proceed As John Does.

As previously stated, if a First Amendment access to the courts violation is to be avoided by this Court, the names of all John Doe Defendants must ultimately be revealed to Plaintiff.  When this occurs, the unnamed Defendants will undoubtedly seek to do what the Doctor has done in this case through the intervention of the Attorney General, and that is to proceed anonymously through the litigation.  Hiding the identities of the alleged wrongdoing State actors, however, is not grounded in the law and would violate public policy.  As such, it should not be countenanced by this Court.

In limited circumstances, courts have permitted a plaintiff to use an alias when significant privacy interests or threats of physical harm attend the revelation of a litigant's name. Anonymity has not been permitted to protect economic or professional concerns or when there is the threat of criminal or civil prosecution.  *M.M. v. Zavaras,* 139 F.3d 798, 801 (10th Cir. 1998).  Indeed, the policy embodied in Fed.R.Civ.P. 10(a) requires the names of all parties to appear in the complaint.  That is because lawsuits "are public events."  *Id.* At 803.  Anonymity should be permitted only in "exceptional cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity."  *Id.*  In the American civil justice system there is "the presumption of openness."  *Id.*  The Tenth Circuit went on to note that the cases permitting anonymity have almost always involved abortion, birth control, and welfare prosecutions involving abandoned or illegitimate children. Anonymity is only permitted when an extremely

important privacy interest can be established.  Ultimately this decision is left to the sound discretion of the trial court.  Professional embarrassment or consequences do not warrant anonymity.  *Coe v. U.S. Dist. Court for Dist. of Colorado*, *supra*, 676 F.2d 411 (10th Cir. 1982).

The Second Circuit has enumerated some of the considerations for this Court when deciding whether anonymity should be permitted.  In *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189-190. (2d Cir. 2008) the court balanced the plaintiff's interest in anonymity against both the public interest in disclosure and any prejudice to the other party. *Id.* at 189. The court identified ten factors to consider when determining whether a plaintiff can proceed anonymously including: 1) whether the litigation involves highly sensitive matters; 2) whether physical retaliation or psychological harm may befall a party; 3) whether the injury will likely occur regardless of anonymity; 4) whether a party is particularly vulnerable; 5) whether a governmental party seeks anonymity; 6) prejudice accruing to the non-moving party; 7) whether the party has already been disclosed; 8) whether the public interest mandates disclosure; 9) Whether purely legal issues make the public interest in disclosure weak; 10) alternative methods of protecting identity.

In *Roe v. Catholic Health Initiatives* Colo.,2012 U.S. Dist. LEXIS 713(D. Colo.Jan. 4, 2012) the court stated that in matters of anonymity, the Tenth Circuit has historically taken its lead from the Eleventh Circuit, which lists three factors to be considered by this Court.  They include: 1) "matters of a highly sensitive and personal nature"; 2) cases involving a "real danger of physical harm"; and 3) instances "where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's

identity." *Id*. The court also must "weigh the public interest in determining whether some form of anonymity is warranted." *Quoting Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000).

Regardless of the balancing test this Court employs, the public interest component of the equation is such that any other concerns pale in comparison. The only truly countervailing relevant consideration before this Court is the "real danger of physical harm" consideration. Any argument of physical harm made by the Defendants however, will be exposed as exaggerated, overblown and speculative.

The doctor has already been publicly disclosed. He, along with all of the other John Does, had volunteered to kill Clayton Lockett in exchange for taxpayer's dollars. Public exposure comes with the job. His identity was not discovered during the course of any "civil or criminal litigation" in violation of any statute, whether constitutional or otherwise. The State has proffered no facts indicating any physical harm has befallen or will befall the doctor. His name has been internationally published as the doctor who botched the execution. The State has not sought to dismiss him from the case due to his complete lack of involvement in the incident. Prior to filing the lawsuit, undersigned counsel specifically asked the doctor whether or not he was indeed the doctor who participated in the execution of Clayton Lockett. Counsel told the doctor that if he denied any such involvement, he would not be sued. The doctor responded by saying "Y'all need to talk to the prison about that" and hung up the telephone without further comment. Coupled with other information known to undersigned counsel that the named doctor was in fact the correct party, a good faith basis existed for naming the doctor in the complaint and counsel is confident he has named the correct party. The Executive Director of the

Department of Corrections and the Assistant Warden have both been named in the complaint. Both had extensive hands-on involvement in the execution yet there is no effort being made to protect their anonymity. As far as the pharmacies which provided the chemicals are concerned, they are business entities and not actual persons. Undersigned counsel believes he knows the identities of these business entities however not with the degree of certainty necessary to name them in the lawsuit. If disclosing the names of the businesses leads to economic harm to them, they should have considered that possibility prior to selling untested, unapproved drugs to the other defendants for purposes of killing Clayton Lockett.

The public has a compelling right to know the names, backgrounds and qualifications of all of the defendants in this action. The actions of the Defendants in this case led to an international outcry, unprecedented in the history of this country. At the end of the day, if Plaintiffs prevail, it is the taxpayers of Oklahoma who will pay the damages or the attorney's fees. The public has an absolute right to examine the training, experience and qualifications of the individuals employed by the State to kill Clayton Lockett. If the State is hiring unqualified people for this critically important job, the public has a right to know that and demand changes in the procedures involved with hiring and training people on the execution team.

It would be futile to permit any of the Defendants to proceed as John Does as the trial of this matter will be a very public event likely subject to extensive international media coverage. The trial will not be a closed, sealed event occurring behind closed doors. Depositions will be taken of each Defendant and investigations will be conducted which will involve non-parties who have every right to disclose the identities of all

Defendants.  In sum, the public interest demands that these Constitutional civil rights violators be named.

### IV.  The First Amendment Right Of The Public To Information Involving Executions Must Be Respected.

A core purpose of the First Amendment is to protect the unfettered discussion of governmental affairs. *Globe Newspaper Co.*, 457 U.S. at 604 (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).  Access to information *about* government affairs is, then, an essential antecedent right to the freedom of speech and an important indicator of a free society. *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 874 (9th Cir. 2002)("While the right of access is not enumerated in the First Amendment, it is nonetheless necessary to the enjoyment of other First Amendment rights."); *see also Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936)("informed public opinion is the most potent of all restraints upon misgovernment"). Resultantly, courts have held that the First Amendment is violated when states unduly restrict public access to some governmental proceedings as well as to certain information of public concern.

The First Amendment right of access differs to a certain extent depending on what type of access the aggrieved party is seeking.  There are two lines of cases can potentially use to resolve whether Plaintiff has a First Amendment right of access to information about his execution.  Those cases can be loosely categorized as cases testing whether there is a right of access to criminal proceedings and cases testing the right of access to prisons. *See Globe Newspaper Co. v. Superior Court Norfolk Cnty.*, 457 U.S. 596 (1982)(press access to a criminal trial).  But all cases addressing the constitutionality of statutes like the Oklahoma secrecy statute discuss whether access to executions should be

treated as access to a proceeding under *Richmond Newpapers* and its progeny or as access

to prison information under *Houchins*.

### A. *Richmond Newspapers* and the First Amendment right of access to criminal proceedings

The Supreme Court has repeatedly recognized that the First Amendment

includes a qualified right of access to criminal proceedings. *See Press-Enterprise*

*Co. v. Superior Court*, 464 U.S. 501, 510-22 (1984)(press access to voir

dire)(hereinafter "Press-Enter I"); *Press-Enter. Co. v. Superior Court*, 478 U.S. 1,

8-14 (1986)(press access to preliminary hearings)(hereinafter "Press-Enter II").

Justice Brennan in his concurrence in *Richmond Newspapers, Inc. v. Virginia*, 448

U.S. 555 (1980)(Brennan, J., concurring), outlined a two-step analysis for

determining whether a First Amendment right of access exists for any particular

government proceeding. Six years later in *Press-Enter II*, the court explicitly

adopted Justice Brennan's test from *Richmond Newspapers*, explaining that:

> In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a " 'tradition of accessibility implies the favorable judgment of experiences' " *Globe Newspaper*, 457 U.S., at 605, (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 589, (1980) we have considered <u>whether the place and process have historically been open to the press and general public</u>. [ … ] Second, in this setting the Court has traditionally considered <u>whether public access plays a significant positive role in the functioning of the particular process</u> in question. *Globe Newspaper*, supra, 457 U.S., at 606.

*Press-Enter. Co. v. Superior Court of California for Riverside Cnty*., 478 U.S. 1, 8 (1986)

(citations in original).

The twin considerations from *Richmond Newspapers* and its progeny are referred

to as the "history" and "logic" prongs of the analysis. If a proceeding satisfies the

"history" and "logic" prongs of the *Richmond Newspapers* test then a First Amendment

right of access is attached.  Some courts have applied both prongs equally without any

discussion of priority, but the Third Circuit has emphasized the importance of the

historical prong, finding that arguments about whether the public's participation enhances

the functioning of the process in question (the logic prong) "cannot carry the day [ … ]

because it has not developed independent of, and unrelated to, historical antecedents."

*First Amendment Coal. v. Judicial Inquiry & Review Bd.*, 784 F.2d 467, 473 (3rd Cir.

1986).

Even if there is a First Amendment right to access, the right is not absolute.  A

finding of attachment is insufficient to strike down a statute on First Amendment

grounds.  *Press-Enter II*, 478 U.S. at 9. If a court determines that a governmental

proceeding has historically been open to the public and that it is good public policy to

allow for public access and scrutiny, a restriction on access can still be constitutional if

the state shows that its interest in denying access is "essential to preserve higher values,"

and is, "narrowly tailored to serve that interest." *Id*.

### B.  Courts have used the *Richmond Newspapers* analysis to demonstrate that a First Amendment right of access is attached to *viewing* executions

The argument that executions are a "proceeding" that satisfies the *Richmond*

*Newspapers* test for a First Amendment right of access was used successfully in

*California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002), and in

*Philadelphia Inquirer, et al., v. Wetzel*, 906 F.Supp.2d 362 (M.D. Pa. 2012).

In *California First Amendment Coalition* the Ninth Circuit found that there was a

historical pattern of openness with respect to the California death penalty and that public

access to executions is "critical in determining whether execution by lethal injection comports with 'evolving standards of decency.'" *Id.* at 876 (quoting *Trop v. Dulles*, 356 U.S. 86 (1958)).  After establishing that a First Amendment right of access attached to executions, the court then moved through a scrutiny analysis.  The court held that California's statute limiting access to executions failed to identify any compelling penological concern to justify denying access to executions. The Ninth Circuit ultimately concluded that the petitioner's First Amendment right of access protected their right to "<u>view</u> the entire execution," as well as to <u>view</u> "initial procedures [that are] 'inextricably intertwined' with the process of putting an inmate to death." *Id.* at 877.

The right to view an entire execution was also upheld in *Philadelphia Inquirer v. Wetzel*, where the U.S. District Court for middle Pennsylvania held that there was adequate evidence that the Pennsylvania death penalty was historically open to the public and that access to executions satisfied the "logic" prong of the *Richmond Newspapers* test. In deciding whether an execution was a "proceeding" within the meaning of *Richmond Newspapers*, the District noted that while the Supreme Court's opinions in *Richmond Newspapers* and its progeny focused on proceedings in the context of criminal trials, the cases do not explicitly limit the analysis to judicial proceedings. *Id.* at 367. Resultantly some lower courts, including the Third Circuit, have been willing to extend the right of public access to diverse governmental proceedings. *See North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198, 207 (3rd Cir. 2002)(holding that *Richmond Newspapers* is the appropriate analysis for testing First Amendment right of access for deportation hearings).

**C.  The estate of Clayton Lockett has a First Amendment right of access to information about the execution team and Oklahoma execution protocol under a *Richmond Newspapers* analysis**

When the United States moved from public to private executions in the Eighteenth Century, "the states implemented procedures that ensured executions would remain open to some public scrutiny," including by the press. Louis P. Massur, *Rites of Execution* 25-27 (1989).  Oklahoma has a long history of making executions open to the press and some members of the public.

The "logic" prong of the *Richmond Newspapers* analysis asks whether public access plays a significantly positive role in the functioning of the particular process in question. There are several arguments to make on this prong as to why public access is an essential component to the proper functioning of capital punishment.

First, the Supreme Court's Eighth Amendment cruel and unusual jurisprudence does not include a rigid standard and instead relies on an informed public discourse to shape the standard. In *Trop v. Dulles*, the Supreme Court held that courts must determine what type of execution constitutes cruel and unusual punishment based on the "evolving standards of decency that mark the progress of a maturing society." 356 U.S. at 101.

Second, public access to executions and execution information protects the constitutional role of the judiciary with respect to the Eighth Amendment.  Put another way, confidentiality statutes prevent the judiciary from fulfilling their constitutional duty as a check upon the other branches of government. The Supreme Court has pronounced standards for testing whether a manner of

execution violates the Constitution. *See Baze v. Rees*, 533 U.S. 35, 61-62 (2008)("What that [Eighth] Amendment prohibits is wanton exposure to 'objectively intolerable risk'"). The court's articulation of a standard for judicial review necessarily entails an assumption by the court that plaintiffs will have access to information about execution methods that can then be tested in the Article III arena. The Ninth Circuit in *Wood v. Ryan*, 759 F.3d 1076 (9th Cir. 2014) acknowledged this concern, noting that information concerning execution protocol "is not only of general interest to the public, it is important for consideration by the courts." *Wood*, 759 F.3d at 1087 ("data concerning gas chamber executions informed our decision to ban such executions, [ … ] it also informed our decision to sustain hanging as a method of execution"). If courts allow states to shroud their execution procedures in secrecy then any meaningful Eighth Amendment restraint on executions will be obliterated. Not only would a holding to that effect have calamitous implications for basic human rights in our country but it would also run contrary to our history of meaningful judicial review in the Eighth Amendment context.

### D.  *Pell, Saxbe,* and *Houchins* – the First Amendment right of access to prison conditions

The competing analysis of whether a person has a First Amendment right of access to executions and related information comes from a trio of cases in which the Supreme Court addressed the press's First Amendment right of access to prisons and prison conditions. *See Pell v. Procunier*, 417 U.S. 817 (1974)(challenging a California policy that prevents the press from getting interviews with specific inmates); *see also*

*Saxbe v. Wash. Post Co.*, 417 U.S. 843 (1974) *and Houchins v. KQED, Inc.*, 438 U.S. 1 (1978)(broadcast company brought suit after being denied access to a portion of a county jail where a prisoner had reportedly committed suicide). While the Court acknowledged in all three cases that information about prison conditions is both "newsworthy and of great public importance," and that the First Amendment "protects the right of the public to receive such information," the court ultimately held that the press had no First Amendment right of access beyond that of the general public. The court's strongest condemnation of a First Amendment guarantee of access to prison information is in *Houchins* where a plurality opined that the Constitution "afford[s] no basis for [ … ] a right of the public or the media to enter these institutions," and concluded that access to prisons is a "question of policy for the legislative body." *Houchins*, 438 U.S. at 9.

Courts have been inconsistent in whether and how to apply *Houchins* in this context. The basic formulation is that: (1) access to execution methods, training, drug sources, etc., is a question of "prison access" not of "access to a governmental proceeding"; and (2) *Houchins* explicitly rejects the possibility that the press or public at large has a First Amendment right to access prison information. The defendants in *Philadelphia Inquirer*, *Owens v. Hill*, and *Wood v. Ryan* all made this argument but with varying results.

In *Wood v. Ryan* the Ninth Circuit rejected the State's argument that *Houchins* governs the constitutionality of execution confidentiality statutes, holding that because the Ninth Circuit had already recognized a right to "view" executions, and that documents about the executions were "inextricably intertwined with that recognized right," there is also a First Amendment right of access to documents and information

related to the execution.

Similarly, in *Philadelphia Inquirer* the district court addressed and rejected the defendant's assertion that access to executions is governed by *Houchins*.  The court distinguished the facts in *Houchins* from executions in Pennsylvania by pointing out that executions in Pennsylvania are not conducted inside penal institutions and are thus beyond the scope of cases that limit access to prisons. *Philadelphia Inquirer*, 906 F. Supp. 2d at 369 ("Defendants err in concluding that *Houchins* applies to Plaintiffs' facts. Executions in Pennsylvania are not conducted inside penal institutions."). Executions in Oklahoma take place in the Oklahoma State Penitentiary. However, the court in *Philadelphia Inquirer* went on to say that even if the plaintiffs had to enter the penitentiary to witness an execution, *Houchins* would not control the result. *Id.* ("Even if Plaintiffs did have to enter SCI–Rockview in order to view the execution, the Court must reject Defendants' argument that *Houchins* would control the Court's result."). In reaching that conclusion the court reasoned that because Pennsylvania law allowed up to six media witnesses to view and report on an execution, and what the plaintiffs were requesting was to view the entire execution rather than the limited portion currently allowed by the DOC, the requested relief was "quite different from the relief sought in *Houchins*" because they were requesting an "extension of a right" already existing rather than the "unregulated access" requested by the plaintiffs in *Houchins*.

    **E.  Cases specifically addressing confidentiality statutes and**
     **whether there is a First Amendment right of access to**
     **information about execution teams and protocol**
      **1.  *Wood v. Ryan***

This year in *Wood v. Ryan*, 759 F.3d 1076 (9th Cir. 2014), the Ninth Circuit considered whether the First Amendment right to <u>view</u> executions (*California First*

*Amendment Coalition*) supported the conclusion that there is a First Amendment right of access to <u>information</u> concerning the <u>methods</u> of execution.[2]  The case arrived in the Ninth Circuit after Wood and five other inmates filed a §1983 suit in the Federal District Court of Arizona, requesting among other things a preliminary injunction to stay his execution.  The district court denied the preliminary injunction and Wood appealed the denial to the Ninth Circuit.  The court in *Wood v. Ryan* did not ultimately decide whether Wood had a First Amendment right to the information he sought, but did hold that the district court had "abused its discretion" in denying the injunction, concluding at that Wood had raised "serious questions as to the merits of his First Amendment claim." *Id.* at 1088.

In its discussion of Wood's First Amendment claim, the Ninth Circuit first recognized that while *Richmond Newspapers* dealt with access to a court proceeding, Ninth Circuit case law has also recognized a First Amendment right of access to "documents related to those proceedings." *Wood*, 759 F.3d at 1081 (citing *Oregonian Publishing Co. v. United States District Court*, 920 F.2d 1462, 1465 (9th Cir. 1990)(recognizing a right of access to plea agreements and "related documents"); *CBS, Inc. v. United States Dist. Court*, 765 F.2d 823, 824-26 (9th Cir. 1995)(post-trial documents, including a motion to reduce a sentence and the prosecutor's response); *Phoenix Newspapers, Inc. v. United States Dist. Court*, 156 F.3d 940, 946-49 (9th Cir. 1998)(transcripts of closed post-trial proceedings).  The court concluded that a right of access to a proceeding entails a right of access to documents that are "intrinsically

---

[2] Wood's underlying § 1983 suit alleged that the Department of Corrections had violated his (1) First Amendment right to petition the government for redress of grievances; (2) his First Amendment right to access information about the manner in which Arizona implements the death penalty; and (3) that Arizona's death penalty protocol violated the FDCA in violation of Art. VI.

associated" with that proceeding. *Id.*

     After determining that a *Richmond Newspapers* analysis was appropriate in this context, the court then moved through the two factors.  In the "history" prong, the court discussed how information pertaining to the execution equipment, procedure, and personnel were historically public information.[3]  In the "logic" prong, the court echoed its own language in *California First Amendment Coalition*, adding that given the flux in lethal injection protocol nationally and "the factual backdrop of the past six months in particular," more information about the drugs used in lethal injections could help the public make "better informed decisions" about lethal injections in this country. *Id.* at 1085 ("several flawed executions this year, including two in Oklahoma, [ … ] have sparked public curiosity and debate over the types – and quality – of drugs that should be used in lethal injections.").

     Unfortunately, as the Oklahoma Attorney General mentioned in his Motion to Strike, the Ninth Circuit's opinion granting Wood a conditional preliminary injunction was vacated by the Supreme Court in *Ryan v. Wood*, 14A82, 2014 WL 3600362 (U.S. July 22, 2014). The Supreme Court, in a one paragraph release, held that the district court judge in Wood's case "did not abuse his discretion in denying Wood's motion for a preliminary injunction." The order to vacate did not address any of the Ninth Circuit's First Amendment analysis, meaning that a legitimate narrow reading of the decision is that the Supreme Court rejected the Ninth Circuit's willingness to find that the district court "abused its discretion."

---

[3] Public accounts supplied information about the types of ropes used for Arizona hangings and the manufacturers who provided them. Arizona newspapers reported openly on gas chambers, describing their size, cost, and makeup, and explained that Eaton Metal Products Co., which supplied gas chambers to states, had a "patent on the death machine."

### 2.   *Owens v. Hill*

This year in *Owens v. Hill*, 295 Ga. 302, 758 S.E.2d 794 (2014), the Georgia

Supreme Court was presented with the question of whether Georgia's statute making

confidential the names and other identifying information of the persons and entities

involved in executions violated death-row inmate Clarence Hill's First Amendment right

of access to that information.  While the court in *Hill* ultimately upheld the

constitutionality of Georgia's analog to Okla. §1015, the case is still noteworthy for two

reasons.  First, while the opinion was hinged on the *Richmond Newspapers* analysis for

determining whether a First Amendment right of access exists for execution information.

*Id.* at 317. The fact that the Georgia Court went through the "government proceeding"

analysis rather than relying on the *Houchin* "prison access" analysis to summarily reject

any First Amendment right of access is instructive, in spite of the fact that Georgia

erroneously found that the test did not demonstrate a right of access.

The second instructive significance of *Hill* is that the Georgia Supreme Court

acknowledged that there could be "serious questions about the constitutionality of the

confidentiality statute," in a case where the plaintiff came closer to presenting a

"colorable [Eighth Amendment] claim under *Baze v. Rees*, 533 U.S. 35 (2008)." *Id.* at

308. The court was not explicit about what exact Constitutional protection would be

violated if a plaintiff demonstrated a more substantial Eighth Amendment claim, but the

fact that they left the door open is valuable and suggests that a court might find a

confidentiality statute to be unconstitutional if there is an Eighth Amendment smoking

gun and the statute is preventing litigation.  As is true of every prior case, the question

before the Georgia Supreme Court did not involve a situation like that confronting this

Court where a cognizable Constitutional tort has already occurred.

**V.  Conclusion**

For all of the foregoing reasons this Court should deny the State's Motion to

Strike, or in the alternative, set this matter for an evidentiary hearing in order to ascertain

whether the State can articulate a compelling reason for secrecy.

Respectfully submitted this 3rd day of November, 2014.

_s/ David A. Lane_
David A. Lane (CO Bar #16422)
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com

_s/ Kathryn Stimson_
Kathryn Stimson (CO Bar #36783)
THE LAW OFFICE OF
KATHRYN J. STIMSON
1544 Race Street
Denver, CO 80206
(720) 638-1487
kathryn@stimsondefense.com

_s/ Mark Henricksen_
Mark Henricksen
HENRICKSEN & HENRICKSEN
LAWYERS, INC.
600 North Walker, Suite 201
Oklahoma City, Oklahoma  73102

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

JOHN D. HADDEN, OBA#18716
JEB E. JOSEPH, OBA#19137
AARON J. STEWART, OBA#31721
Assistant Attorney General
Oklahoma Attorney General=s Office
Litigation Division
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 521-3921
Facsimile: (405) 521-4518
Email: john.hadden@oag.ok.gov
Email: jeb.joseph@oag.ok.gov
Email: aaron.stewart@oag.ok.gov