## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) THE ESTATE OF CLAYTON
    LOCKETT, by and through its personal
    representative GARY LOCKETT,

            Plaintiff,

v.

(1) GOVERNOR MARY FALLIN, in her
    individual capacity;
(2) ROBERT C. PATTON, in his individual
    capacity;
(3) ANITA K. TRAMMELL, in her
    individual capacity; *et al.,*

            Defendants.

**Case No: CIV-14-1119-HE**

## AMENDED COMPLAINT

Plaintiff by and through its attorneys David Lane, Kathryn Stimson, and Mark Henricson, state as follows:

## INTRODUCTION

1.    The court-ordered killing of Clayton Lockett by the Defendants as punishment for his brutal murder of Stephanie Neiman, was a violation of the Eighth Amendment to the United States Constitution, a violation of innumerable standards of international law, and a violation of elementary concepts of human decency. The barbaric spectacle was a disgrace to the People of the United States of America and brought shame to the State of Oklahoma.

2.    The tortured death of Clayton Darrell Lockett occurred on April 29, 2014, when he finally, slowly died after a cruel attempt by the Defendants to kill him by lethal

injection in the state of Oklahoma. In a spectacle rarely seen in the "civilized" world, Clayton Lockett writhed in agony, convulsed, gasped for breath, moaned repeatedly and took approximately 43 minutes to die at the hands of the Defendants.  The intentional killing of Clayton Lockett was such a brutal and barbaric event that it caused the President of the United States to take notice and brought worldwide attention to the brutality promulgated by the Defendants in the name of the People of the State of Oklahoma.

       3.     Despite innumerable treaties, protocols and accepted norms of human decency prohibiting human experimentation on unwilling subjects, while cast in the unwitting role of human lab rat for the Defendants, Clayton Lockett was administered an untested mixture of drugs that had not previously been used for executions in the United States. Although the attempt to kill Clayton Lockett was stopped, Lockett nevertheless died 43 minutes after being injected. He writhed, groaned, convulsed, and spoke during the process and attempted to rise from the execution table fourteen minutes into the procedure, despite having been declared unconscious.  After being declared unconscious Lockett was able to raise his head and said, "Oh, man", and "I'm not..." and according to some sources, "something's wrong". Lockett began writhing at 6:36 p.m. and was observed twitching and convulsing. He attempted to rise from the table at 6:37 p.m. and loudly exhaled.  A lawyer for Lockett reportedly said, "It looked like torture."

       4.     Lockett's execution occurred at Oklahoma State Penitentiary in McAlester, Oklahoma, on April 29, 2014, after he had been tasered by staff and attempted to cut himself earlier that day. After administration of the first drug at 6:23 p.m. CDT, Lockett was declared unconscious at 6:33 p.m.  He apparently was not unconscious, and the

execution was halted after about twenty minutes. He was finally declared dead at 7:06 p.m.

5.      Before the execution, Lockett's stepmother was reported as saying, "I want to know what mixture of drugs are you going to use now? Is this instant? Is this going to cause horrible pain?" and "I know he's scared. He said he's not scared of the dying as much as the drugs administered."

6.      Oklahoma Department of Corrections Director Robert Patton said one of the doctors present stopped the execution after Lockett had a "vein failure".  According to the Department of Corrections, the time for an inmate to be pronounced dead was 6 to 12 minutes in the previous 19 executions before Lockett's.

7.      All three drugs had been administered to Lockett, but it was unclear how much entered his system. A vein in the groin was selected as the injection site, and a cloth was put over it to prevent witnesses seeing the groin area. This prevented the onsite Defendants from seeing that the IV connection had failed.  Patton as well as the autopsy report said "the chemicals did not enter into the offender".  Prison officials had reportedly discussed taking Lockett to a hospital before he died.

8.      A subsequent report showed Clayton Lockett's execution was halted 33 minutes after it began, as an IV insertion problem prevented the drugs from entering his circulatory system as they were administered. A doctor, presumably Defendant Doctor John Doe, said there were not enough drugs left and that Lockett had not been given enough drugs to cause death. The report noted:

>   The doctor checked the IV and reported the vein had collapsed, and the
>   drugs had either absorbed into tissue, leaked out or both. [...] Patton asked
>   if enough drugs had been administered to cause death, to which the doctor
>   replied "no". The director then asked if another vein was available to

complete the execution, and if so, were there enough drugs left. The
doctor answered no to both questions.

In point of fact, more drugs were indeed available as Oklahoma had scheduled a

"double header" for the killing chamber that night.  The drugs reserved for

CharlesWarner were still available while Clayton Lockett was being slowly tortured

to death.  The Defendants had the ability to administer a fatal dosage and put Mr.

Lockett out of his apparent misery, but instead, they made a conscious decision to

permit Clayton Lockett to die a slow, agonizing death in order to try it all again later

that night on Charles Warner.

9.      Oklahoma Governor Mary Fallin had strongly pushed for the execution to

take place despite her knowledge about the lack of standard drugs being used in

combinations never before tested and that experts had warned that the drugs used could

cause a slow, painful, agonizing death.  She initially issued an executive order to proceed

despite a stay by the Supreme Court of Oklahoma. Republican allies of Fallin started

impeachment proceedings against the justices who tried to delay the execution; the stay

was later lifted. Lockett's lawyers also unsuccessfully sought to force Oklahoma to reveal

the source of the drugs, which the state refused to do. Oklahoma officials testified that the

drugs to be used in Lockett's execution had been legally obtained and had not expired.

10.      In 1999, Clayton Lockett kidnapped, assaulted, and shot innocent

nineteen-year-old Stephanie Neiman and ordered an accomplice to bury her while she

was still breathing. She died from two wounds from a shotgun fired by Lockett. In 2000,

he was convicted of murder, rape, forcible sodomy, kidnapping, and assault and battery

and was sentenced to death.  Clayton Lockett paid for his crimes with his life, and now

the Defendants must be forced to pay for their crimes against humanity.

4

**PARTIES**

11.     The Estate of Clayton Lockett by and through its representative, his brother Gary Lockett, is the Plaintiff in this action.  At all times relevant to this complaint, Clayton Lockett was a resident of Oklahoma and his estate has been filed in the State Courts of Oklahoma.

12.     All Defendants in this action were acting under color of State law in both individual and official capacities and all Defendants reside in either the Western District of Oklahoma, or were acting jointly with the officials named from the Oklahoma Department of Corrections, headquartered in the Western District of Oklahoma.

13.     Upon information and belief, the Defendant Governor Mary Fallin encouraged the immediate execution of Clayton Lockett despite knowing of a substantial risk that the drugs to be used were untested and a tortured painful death was likely.  On information and belief, Defendant Fallin was directly contacted during the period of time that Clayton Lockett was being tortured to death and informed of the circumstances surrounding his torture.

14.     The Defendant Robert C. Patton is Director of the Department of Corrections of Oklahoma and has an official residence within this District.  Despite having no medical background, he was charged with the responsibility of determining what drugs to use in the killing of Clayton Lockett.  He is also responsible for the training and supervision of those charged with the responsibility of actually killing Clayton Lockett.

15.     The Defendant Anita K. Trammell is the warden of the Oklahoma State Penitentiary and an employee of the Department of Corrections of Oklahoma. She has an

official residence within Pittsburg County. The Defendant Trammell is assigned by Oklahoma law with the responsibility to carry out death warrants issued by Oklahoma courts, including those issued in the Plaintiffs' cases. The Field Memorandum issued as an instruction manual from the Department of Corrections describing the procedures to be used in killing prisoners vests the Defendant Trammell with sole discretion to select the lethal drugs to be used in the Plaintiffs' executions. The Field Memorandum includes an open-ended list of authorized lethal drugs and procedures. Defendant Trammell, despite having no medical training, in conjunction with Defendant Patton, decided upon what drugs to use, and in what combination to use them, to kill Clayton Lockett.

16.    The Defendant Patton is assigned by Oklahoma law with authority over execution of all death sentences, and with responsibility to supervise all activities of the Department of Corrections, including the official activities of the Defendant Trammell.  It is alleged that by permitting his employees to use untested drugs in a human medical experiment, Patton failed to adequately train and supervise his employees.

17.    The Defendants Patton and Trammell executed Clayton Lockett using written procedures set out in Oklahoma State Penitentiary Field Memorandum No. OSP-040301-01. This Field Memorandum has been revised and altered repeatedly, most recently on March 21, April 14, and April 25, 2014.

18.    The Field Memorandum mandates participation in each execution by a licensed physician. The functions of this official include insertion of intravenous lines into the condemned person, and performance of cut-down procedures to gain intravenous access to the condemned person.

19.    Upon information and belief, the Defendant Doctor John Doe is the doctor

6

who engaged in human medical experimentation in torturing Clayton Lockett to death, in violation of the Eighth Amendment, the Hippocratic Oath, and numerous international treaties and protocols including those established at the Nuremberg Doctor Trials dealing with human experimentation on unwilling prisoners.  Doctor John Doe agreed to kill Clayton Lockett in exchange for money paid to him by the State of Oklahoma.  He did this while using whatever chemicals provided to him by several of the other Defendants and made by the Defendant pharmacies named in this complaint.  He was willing to, and did in fact, conduct the medical experiment engaged in by Defendants to kill Clayton Lockett regardless of the fact that these chemicals had never been approved or tested by any certifying body.  Doctor John Doe failed to quickly and painlessly kill Clayton Lockett by inadequately inserting intravenous lines into his body, which would have been used to carry the experimental drugs into the veins of Clayton Lockett with the hope that they would quickly and painlessly kill him.  Doctor John Doe's participation in the failed medical experiment directly caused the tortured death of Clayton Lockett.

20.    Defendant "John Doe emergency medical technician/paramedic" or person with similar qualifications and experience in intravenous line (IV) insertion participated in torturing Clayton Lockett to death. The functions of this official include assisting in the insertion of intravenous lines into the condemned person.  It is believed that this unknown person participated in the torture of Clayton Lockett.

21.    The Defendants "John Doe Executioners #1, #2, and #3" are the officials who performed the functions described in The Field Memorandum, which mandates participation in each execution, by three persons whose function is to administer lethal drugs to the condemned person through the intravenous lines.  They directly participated

7

in torturing Clayton Lockett to death.

22.    "John Doe compounding pharmacies" prepared and sold the drugs used on Clayton Lockett to the Department of Corrections for purposes of killing Clayton Lockett.  On information and belief the compounding pharmacies had no knowledge of whether the substances they sold would be effective or not in killing him quickly and humanely or whether they would cause a tortured death.  Nevertheless, they touted the efficacy of the combination of drugs they sold to the other defendants knowing that they would be used to attempt to kill Mr. Lockett.  They directly participated in the tortured death of Clayton Lockett.

**Jurisdiction and Venue**

23.    Jurisdiction over these claims is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343, and this case is brought pursuant to 42 U.S.C. § 1983. Jurisdiction supporting Plaintiffs' claims for attorney fees and costs is conferred by 42 U.S.C. § 1988.

24.    Venue is proper in the Western District of Oklahoma pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Oklahoma. This Court has subject matter jurisdiction under 28 U.S.C. § 1343(a).

**Background**

25.    Between 1990 and 2010, the combination of drugs set out in section IX.C.7.a of the Field Memorandum was used in at least 93 Oklahoma executions. Starting in 2010, the Defendants began to use pentobarbital in lieu of sodium thiopental to execute condemned persons, as currently authorized by section IX.C.7.b of the Field Memorandum. The pentobarbital first used in several executions was in its originally

manufactured form.  In more recent executions, however, compounding pharmacies produced pentobarbital.

26.    In the version adopted by the Defendants on March 21, 2014, the Field Memorandum authorized the use of at least three procedures that had never before been used in Oklahoma or anywhere else.  The Nuremberg Tribunals called this process "human experimentation on unwilling prisoners" and resulted in the execution of numerous doctors who participated in these experiments.

27.    Two of the newly authorized procedures identified in paragraph 27 involved use of midazolam, a drug never before used in any Oklahoma execution. The midazolam procedures are set out in sections IX.C.7.d and IX.C.7.e of the Field Memorandum.

28.    The Defendants Patton and Trammell have admitted that no experts were directly consulted in connection with their development of the procedures set out in the March 21, 2014 version of the Field Memorandum.

29.    On April 1, 2014, the Defendants Patton and Trammell, through their counsel, notified the now-deceased Clayton Lockett that he would be killed by administration of midazolam, pancuronium bromide, and potassium chloride, in accordance with section IX.C.7.e of the Field Memorandum.

30.    In the April 1 notice identified in paragraph 30, the Defendants Patton and Trammell stated that the pancuronium bromide and midazolam would be compounded by a compounding pharmacy.

31.    On April 4, 2014, the Defendants Patton and Trammell countermanded the April 1 notice with regard to the source of midazolam. According to the Defendants, the midazolam would now be obtained from "[a] source of manufactured midazolam," while

the pancuronium bromide would remain compounded.

32.    On April 11, 2014, the Defendants Patton and Trammell countermanded the April 1 and April 4 notices with regard to pancuronium bromide. According to these Defendants, pancuronium bromide would no longer be used to execute Clayton Lockett. Instead, vecuronium bromide would be used, and would be obtained from a "manufactured source."

33.    On April 14, 2014, the Defendants Patton and Trammell changed the written procedures in section IX.C.7.e of the Field Memorandum, which had previously been noticed as those that would be used in the executions of Clayton Lockett. In the new procedures, the prescribed concentration of midazolam in each lethal injection syringe was raised tenfold, from 50mg/100 ml to 50mg/10 ml.

34.    On April 25, 2014, the Defendants Patton and Trammell once again changed the written procedures set out in the Field Memorandum, this time with an addendum.

35.    On April 29, 2014, the Defendants used their untested drugs and procedures in torturing Clayton Lockett to death.

36.    Upon information and belief, Defendants Patton and Trammell have no medical or scientific training and have no basis whatsoever to determine whether the drug cocktail they concocted would quickly and painlessly kill Clayton Lockett.

37.    About 13 minutes after the attempt began, Clayton Lockett began to speak and roll his head from side to side. Soon, Clayton Lockett's body began to buck and writhe, as if he was trying to raise himself from the gurney to which the Defendants had bound him. Clayton Lockett next tried to raise his head and shoulders away from this gurney. As he did so, he clenched his teeth and grimaced in pain. After enduring 43

10

minutes of agony, Clayton Lockett was declared dead.

38.   The killing by torture of Clayton Lockett inflicted severe pain, unnecessary suffering, and a lingering death on Clayton Lockett, and violated the Eighth and Fourteenth Amendments to the United States Constitution as well as numerous international treaties, conventions and protocols all of which the United States is a signatory party.

39.   The grotesque killing of Clayton Lockett was the latest in a series of executions by the Defendants that have violated the Eighth and Fourteenth Amendments to the United States Constitution by inflicting severe pain and needless suffering. Other such violations have occurred during the executions of Robyn L. Parks, Scott D. Carpenter, Loyd W. LaFevers, and Michael L. Wilson.

**First Claim for Relief**
**Eighth Amendment violation – Torture**
**(Applied to All Defendants)**

40.   All Statements of fact contained in this Complaint are hereby incorporated into this paragraph as though set forth fully herein.

41.   Because the Defendants essentially used Clayton Lockett as a human guinea pig and were experimenting with drugs and combinations thereof with no knowledge of the effects of these drugs in the combinations used, there was a substantial risk that use of the drugs and procedures would produce severe pain, needless suffering, and a lingering death for Mr. Lockett. This risk is best illustrated by the severe pain, needless suffering, and lingering death inflicted by the Defendants on Clayton Lockett while he was being tortured to death.

42.   The Defendants have acted with deliberate indifference to the risk of torture

being inflicted on Clayton Lockett.  Indeed, abundant expert testimony from other

jurisdictions using similar drugs were in the hands of the Defendants prior to Clayton

Lockett's death and it warned them that Clayton Lockett had a substantial risk of a slow,

painful, torturous death if these drugs were used.

43.    Torturing someone to death is a violation of the Eighth Amendment to the

United States Constitution as well as innumerable international standards.

44.    The Preamble to the Universal Declaration of Human Rights notes that the

Declaration was inspired by the "disregard and contempt for human rights resulted before

and during the Second World War, in barbarous acts which outraged the conscience of

mankind."  Article 5 of the UDHR states: "No one shall be subjected to torture or to

cruel, inhuman or degrading treatment or punishment." Universal Declaration of Human

Rights,  G.A. res. 217A (III), U.N. Doc A/810 at 71 (1948).

45.    The prohibition of torture was violated by the defendants in this case as set

forth in the UDHR.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004) (cautioning

that courts "should require any claim based on the present-day law of nations to rest on a

norm of international character accepted by the civilized world and defined with a

specificity comparable to the features of the 18th-century paradigms we have

recognized"); *cf. Filartiga v. Pena-Irala,* 630 F. 2d 876, 878 (2d Cir. 1980) (holding that

"deliberate torture perpetrated under color of official authority violates universally

accepted norms of the international law of human rights, regardless of the nationality of

the parties," thus providing federal jurisdiction under 28 U.S.C. § 1350).

46.    Clayton Lockett had a right under the Eighth Amendment to not be tortured

to death by the Defendants.  Once they witnessed or knew about even the likelihood of a

slow, painful, lingering death, they were obligated to not go through with the killing .

47.   The fact that the Defendants all had a hand in, and personally participated in the process culminating in the torture of Clayton Lockett gives rise to liability for each Defendant under the Eighth Amendment.

**Second Claim For Relief**
**Eighth Amendment – Using Untested Drugs and Human Medical Experimentation**
**(Applied to All Defendants)**

48.   All Statements of fact contained in this Complaint are hereby incorporated into this paragraph as though set forth fully herein.

49.   Defendants began to kill Clayton Lockett using midazolam.

50.   The procedure used by the Defendants required sequential intravenous injections of 100 milligrams of midazolam, 40 milligrams of vecuronium bromide or a comparable non-depolarizing neuromuscular blocking drug of comparable strength, and 200 milliequivalents of potassium chloride.  The particular "cocktail" used to kill Clayton Lockett had never been tried on a human being before and Defendants knew of no scientific test that had ever concluded that the use of these drugs in the combination used here would humanely kill Clayton Lockett.  The Defendants were thus engaged in human medical experimentation on an unwilling, helpless, prisoner subject in violation of International Law and the Eighth Amendment.

51.   When administered to a conscious or semi-conscious individual, 40 milligrams of vecuronium bromide, or a comparable non-depolarizing neuromuscular blocking drug of comparable strength, will produce paralysis and a slow and painful death by asphyxiation. After this agent takes full effect, a person under its influence will be unable to communicate the severe pain and needless suffering being experienced.

13

52.   When administered to a conscious or semi-conscious individual, 200 milliequivalents of potassium chloride will produce burning and intense pain as it circulates through the body, eventually causing death by cardiac arrest.  It has been analogized by individuals who have accidentally been dosed with this chemical as the equivalent of 'molten lava being injected into my body' or, as in the last words ever spoken by Oklahoma prisoner Michael Wilson as he was being poisoned to death by the State of Oklahoma, "I feel my whole body burning."

53.   Either of the modes of death described violates the Eighth and Fourteenth Amendments to the United States Constitution, by inflicting severe pain, needless suffering, and a lingering death.

54.   Midazolam is incapable of producing a state of unawareness that will be maintained after either of the other two pain-producing drugs, vecuronium bromide (or its substitute) and potassium chloride, are injected.  It frequently does not, and in Clayton Lockett's case *did not* render him unconscious thus making him aware of the pain of the other two drugs.

55.   One of the characteristics of midazolam is that it cannot relieve pain. A person who is rendered unaware by midazolam and then subjected to severe pain will return to awareness and experience that pain. For that reason, midazolam is not suitable as a stand-alone anesthetic. It is merely a sedative. The domestic suppliers of midazolam have not labeled it for use as a stand-alone anesthetic. The federal Food and Drug Administration has not approved midazolam for use as a stand-alone anesthetic.

56.   A person subjected to lethal injection with midazolam can suffer severe pain and be aware of that pain — even if that person is unable to demonstrate the awareness of

14

that pain, owing to paralysis by vecuronium bromide, or its substitute.

57.   As used in the procedure the high dosage of midazolam carries a substantial risk of producing tonic-clonic seizures and convulsions. Such conditions can result in severe pain and needless suffering.

58.   Use of midazolam to kill Clayton Lockett also carried a substantial risk of a paradoxical reaction, which occurs when a drug does not work as intended. A paradoxical reaction to midazolam would cause an individual to remain aware as the execution proceeds. As a result of remaining aware, such an individual would experience severe pain and needless suffering as the other injected lethal drugs do their work.

59.   There is a substantial risk of a paradoxical reaction when midazolam is administered in high doses to individuals with a history of aggression or impulsivity, a history of alcohol abuse, or other psychiatric disorders, all of which Clayton Lockett had and this was known to the Defendants.

60.   There is a substantial body of evidence that use of midazolam to execute Clayton Lockett produced severe pain, needless suffering, and a lingering death. This is illustrated by the severe pain, needless suffering, and lingering death inflicted by the Defendants as they attempted to kill Clayton Lockett using midazolam.

61.   By specifying the use of midazolam in executions, and in carrying out the execution of Clayton Lockett with that drug, the Defendants have acted with deliberate indifference to the risk identified in this Complaint.

62.   The use of midazolam caused Clayton Lockett to be subjected to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

**Third Claim For Relief**
**Eighth Amendment – Use of Compounded Drugs In Human Medical**
**Experimentation**
**(Against All Defendants)**

63.    All Statements of fact contained in this Complaint are hereby incorporated into this paragraph as though set forth fully herein.

64.    The Defendants knew prior to the killing of Clayton Lockett that there was a real and immediate threat that they would execute him using one or more drugs that have been compounded by a compounding pharmacy.

65.    American healthcare providers and patients have long relied on the regulation of pharmaceutical manufacturers by the Food and Drug Administration in order to set the standard for identity, purity, potency, and efficacy of prescription medications.

66.    Pharmacy compounding is a practice by which a pharmacist combines, mixes, or alters ingredients in response to a prescription to create a medication tailored to the medical needs of an individual patient.

67.    Compounded drugs are not FDA-approved. This means that the FDA does not verify the identity, purity, potency, quality, safety, or effectiveness of compounded drugs. This also means that compounded drugs lack any FDA finding of manufacturing quality.

68.    Drugs that have not have been manufactured in a FDA-registered facility under current Good Manufacturing Practices, have no assurance of consistent quality from lot to lot or from container to container.

69.    Without FDA approval of a drug and its manufacturing process, there is no reasonable assurance that the drug has the identity, purity, potency, and efficacy that it is

represented to have.

70.   With compounded drugs, Defendants knew that there was a substantial risk that excepient ingredients and active pharmaceutical ingredients were obtained from non-FDA-approved sources.

71.   Defendants knew that there was a substantial risk that any compounded drug to be used in Lockett's execution lacked the identity, purity, potency, and/or efficacy of its FDA-approved counterpart.

72.   There was a substantial and readily identifiable risk that use of compounded drugs having the characteristics described in this Complaint, produced severe pain, needless suffering, and a lingering death for Clayton Lockett. Specific harms that can result from use of compounded drugs include lack of efficacy of the anesthetic drug, due to an ingredient of different identity than its FDA-approved counterpart. Even if the anesthetic drug is fully or partially effective, compounded drugs can cause serious harm and severe pain before loss of awareness. Such harms include painful pulmonary embolisms resulting from deviations in potency or formation of precipitates within the body; nausea and vomiting resulting from deviations in potency; suffocation and gasping for breath; immediate anaphylactic reactions or other excruciating effects resulting from contamination with dangerous allergens, bacteria, fungus. or other impurities; and serious burning pain on injection, as a result of incorrect pH.

73.   These risks were illustrated by the Defendants' killing of Michael L. Wilson on January 9, 2014, using one or more compounded drugs. Michael Wilson's last words and dying declaration, uttered shortly after he was injected with a compounded drug, were "I feel my whole body burning."

74.   In procuring drugs that have been compounded, and in carrying out executions with those drugs the Defendants have acted with deliberate indifference to the constitutional rights of Clayton Lockett.

**Fourth Claim for Relief**
**Eighth Amendment – Human Medical Experimentation on Unwilling Prisoners**
**(All Defendants)**

75.   All Statements of fact contained in this Complaint are hereby incorporated into this paragraph as though set forth fully herein.

76.   Clayton Lockett had a right to not be tortured to death by the Defendants under the Eighth Amendment to the United States Constitution.  By attempting to conduct executions with an ever-changing array of untried drugs of unknown provenance, using untested procedures, the Defendants are engaging in a program of biological experimentation on captive and unwilling human subjects. The Defendants' most recent experiment on Clayton Lockett was a failure that produced severe pain, needless suffering, and a lingering death.

77.   Clayton Lockett had an obvious serious medical need.  He needed to die as quickly and as painlessly as was humanly possible.  Instead of taking steps to meet that obvious serious medical need, the Defendants, most of whom lack medical training along with some who do have a medical background, tortured Clayton Lockett to death without any scientifically sound expectation that their experiment would succeed in killing a human being in a way that did not inflict severe pain, needless suffering, or a lingering death.  This is deliberate indifference to Clayton Lockett's serious medical need to die quickly and painlessly.

78.   Not only do the Defendants lack the scientific skills needed to design an

execution procedure using lethal drugs that does not inflict severe pain, needless suffering, or a lingering death the Defendants have refused to consult directly with any experts having those skills.

79.   No accepted experimental protocols involving the scientific method were ever considered by the Defendants.  The Defendants have failed to test their lethal drugs and execution procedures on non-human animals before using them on captive and unwilling human subjects. Without the benefit of non-human animal- testing results, the Defendants have no reasonable justification for conducting high-risk experiments with lethal drugs on human subjects.

80.   In conducting the experimentation on captive and unwilling human subjects the Defendants have acted with deliberate indifference to the Eighth Amendment rights of Clayton Lockett.

81.   While virtually every point in the Nuremberg Code[1] is arguably relevant to experimentation involving novel lethal injection drugs or inadequate protocols, several of its numbered principles seem particularly significant in this context:

  1. The voluntary consent of the human subject is absolutely essential;

  4. The experiment should be so conducted as to avoid all unnecessary physical and mental suffering and injury;

  5. No experiment should be conducted, where there is an *a priori* reason to believe that death or disabling injury will occur; except, perhaps, in those experiments where the experimental physicians also serve as subjects;

  7. Proper preparations should be made and adequate facilities provided to protect the experimental subject against even remote possibilities of injury, disability, or death;

---

[1] "The Doctors Trials" at Nuremberg, resulted in the execution by hanging of Nazi doctors who engaged in torture through human experimentation much like the defendants did in this case. The Nuremberg protocols were adopted internationally by virtually every country on Earth, including the United States.

8. The experiment should be conducted only by scientifically qualified persons. The highest degree of skill and care should be required through all stages of the experiment of those who conduct or engage in the experiment.[2]

82.     To give legal and moral force to the Universal Declaration of Human Rights,[3] adopted by the United Nations General Assembly in 1948, the General Assembly of the United Nations adopted in 1966 the International Covenant on Civil and Political Rights, of which Article 7 states "*No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.*"

83.     The Declaration of Helsinki, promulgated in 1964 by the World Medical Association, is the fundamental document in the field of ethics in biomedical research and has had considerable influence on the formulation of international, regional and national legislation and codes of conduct. The Declaration, revised in Tokyo in 1975, in Venice in 1983, and again in Hong Kong in 1989, is a comprehensive international statement of the ethics of research involving human subjects. It sets out ethical guidelines for physicians engaged in both clinical and non- clinical biomedical research, and provides among its rules for informed consent of subjects and ethical review of the research protocol.[4]

---

[2] U.S. Department of Health & Human Services, *The Nuremberg Code*, at: http://www.hhs.gov/ohrp/archive/nurcode.html, *reprinted from* Trials of War Criminals before the Nuremberg Military Tribunals under Control Council Law No. 10, Vol. 2, pp. 181-182. Washington, D.C.: U.S. Government Printing Office, 1949.

[3] The Preamble to the Universal Declaration notes that "disregard and contempt for human rights resulted before and during the second World War, in barbarous acts which outraged the conscience of mankind," while  Article 5 of  the UDHR states: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." Universal Declaration of Human Rights,  G.A. res. 217A (III), U.N. Doc A/810 at 71 (1948).

[4] Council for International Organizations of Medical Sciences (CIOMS), *International Ethical Guidelines for Biomedical Research Involving Human Subjects* (Geneva 2002), at 15. Available at: www.cioms.ch/publications/layout_guide2002.pdf

84.     The Nuremberg Code has been applied by many federal courts in the past and helps define the Eighth Amendment violation in this case.[5]

85.     Perhaps the most compelling evidence of the universal scope of the norm first articulated in the Nuremberg Code is the global adoption of the Fourth Geneva Convention, which absolutely forbids non-therapeutic experimentation on protected persons in time of war.[6] Article 32 of the Convention prohibits "any measure of such a character as to cause the physical suffering or extermination of protected persons in their hands," including "medical or scientific experiments not necessitated by the medical treatment of a protected person". At present, 196 countries are parties to the Convention, including the United States—which, like the other treaty parties, has attached no reservation to the requirements of Article 32.[7]

86.     Discussing the requirements of Article 32, the court in *Abdullahi v. Pfizer, Inc.,* 562 F.3d 163 (2d Cir.2009), *cert. denied* 130 S.Ct. 3541 (2010) noted:

> According to the commentary, "[p]rotected persons must not in any circumstances be used as `guinea pigs' for medical experiments."
> *Commentary on the Geneva Conventions of 12 August 1949: IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War* 224 (Oscar Uhler & Henri Coursier eds., 1958). This commentary explains that the prohibition is directly related to the first principle of the Nuremberg Code since "[i]n prohibiting medical experiments on protected persons, the Diplomatic Conference wished to abolish for ever the criminal practices from which thousands of persons suffered in the death camps of the [second] world war." The practices involved human medical experiments that were objectionable because they were nonconsensual. *See Brandt,* 2 Nuremberg

---

[5] *Grimes v. Kennedy Krieger Institute, Inc.,* 782 A. 2d 807, 835 (Md. 2001); *In re Cincinnati Radiation Litigation*, 874 F. Supp. 796, 821 (S.D. Ohio, 1995); *Whitlock v. Duke University,* 637 F.Supp. 1463 (M.D.N.C.1986); *Heinrich v. Sweet,* 62 F.Supp.2d. 282, 321 (D.Mass.1999); *United States* v. *Stanley,* 483 U. S. 669, 710 (1987) (O'CONNOR, J., concurring in part and dissenting in part)

[6] Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, art. 32, 6 U.S.T. 3516, 75 U.N.T.S. 287.

[7] ICRC, *Treaties and State Parties*, at http://www.icrc.org/applic/ihl/ihl.nsf/INTRO/380

Trials, at 183. The convention is legally binding on states that have ratified it without reservation to Article 32.[8]

87.     There is a general recognition that the core ethical principles on human experimentation first expressed in the Nuremberg Code have been incorporated into domestic law, most notably in 45 C.F.R. §46 (2009) (Protection of human subjects from involuntary medical experiments).

88.     Above all other defendants, Defendant Doctor John Doe has not only participated in human medical experimentation on an unwilling prisoner, he has violated the Hippocratic Oath as well.[9]

89.     The Defendants, to have utterly and completely abdicated their sacred obligations under the United States Constitution and to have disregarded the most basic principles of human decency as set forth in international law, not only brought horrendous pain and suffering to Clayton Lockett, but disgrace and embarrassment to the entire United States of America.

**Fifth Claim for Relief**
**Eighth Amendment – Failure to Train and Supervise**
**(Applied to Executive Director Patton and Associate Director Trammell)**

90.     All Statements of fact contained in this Complaint are hereby incorporated into this paragraph as though set forth fully herein.

91.     The Defendants Patton and Trammell lacked the expertise needed to develop procedures to ensure against severe pain, needless suffering, and a lingering death in the killing process. Moreover, the Defendants Patton and Trammell have admitted that experts were not directly consulted in connection with their development of the

---

[8] *Id*. at 180, n. 9.
[9]   "Nor shall any man's entreaty prevail upon me to administer poison to anyone; neither will I counsel any man to do so."

procedures set out in the Field Memorandum. The deliberate failure of the Defendants Patton and Trammell to seek out expert assistance has resulted in execution procedures that both created a substantial risk of severe pain, needless suffering, and a lingering death and actually did just those things.

92.    Placement of a central-line is an invasive surgical procedure that is difficult to perform, even by a physician, without specific training and experience. Central line placement can cause great pain, as it requires inserting a catheter into a vein that is not externally visible, and that is situated below layers of skin, tissue, and muscle.

93.    The procedures set out in the Field Memorandum authorize the physician to establish a central line, but do not require that physician to first attempt to gain peripheral intravenous access in the arms, hands, ankles or feet. This defect was illustrated in the torture-killing of Clayton Lockett, where a purported central line was established in Clayton Lockett's groin, despite the ample availability of sites that could have provided peripheral venous-access.

94.    The procedures set out in the Field Memorandum do not require that any backup intravenous line be established in the condemned person. If necessary, such a backup line can serve as a means of delivering an anesthetic drug in the event of a misplaced or faulty primary line. No backup intravenous line was established prior to the killing of Clayton Lockett.

95.    The procedures set out in the Field Memorandum do not require that the intravenous catheter and venous-access site remain visible and uncovered, nor do they require that any person on the execution team observe the venous-access site. Without visual observation, those on the execution team cannot monitor for swelling, fluid

23

leakage, or catheter dislodgement. These conditions can indicate intravenous line infiltration, extravasation, migration, or failure, all of which require immediate corrective action. This defect was illustrated in the torture killing of Clayton Lockett, when the central-line catheter and venous-access site were kept covered and unobserved during the portions of the execution viewed by outside witnesses.  The autopsy report specifically addressed this issue as the major reason for the failed effort to quickly kill Clayton Lockett.

96.   The procedures set out in the Field Memorandum do not require preparation or administration of backup dosages of any of intravenous drugs in case any of the primary dosages prove ineffective. This defect was illustrated in the torture killing of Clayton Lockett, where no backup dosages were available after depletion of the primary dosages.  The only backup drugs on site were apparently earmarked for the subsequent killing that evening of Mr. Charles Warner, another human being who would be the subject of further human experimentation by these Defendants.

97.   The procedures set out in the Field Memorandum fail to require any particular level of experience for the physician, paramedic, executioners, and other personnel, nor do they require any particular training or proficiency level for these personnel. As a result, there is a substantial risk that the procedures will not be administered as written. Such deviations create a substantial risk of severe pain and needless suffering due to, for example, improper placement of intravenous catheters and/or inadequately administered anesthesia.

98.   The procedures set out in the Field Memorandum grant broad discretion to the Defendant Trammell to deviate from any or all of those procedures. The Defendant

Trammell has unlimited discretion to modify execution procedures, including modifications to the drugs used, their dosages, the number of intravenous lines used to deliver the drugs, and the personnel involved in carrying out executions.

99.   When problems arise, as they did during the torture killing of Clayton Lockett, the procedures set out in the Field Memorandum vest ultimate supervisory and decision-making authority in the Defendant Trammell. Yet her position requires no medical training nor even training in the written procedures set out in the Field Memorandum. The Defendant Trammell is not subject to oversight in making changes or modifications to her lethal-injection procedures, nor are there appropriate checks and balances to ensure against severe pain, needless suffering, and a lingering death during the execution process.

100.  Feasible, readily implemented alternative procedures existed that would have significantly reduced the substantial risk that the procedures set out in the Field Memorandum would produce severe pain, needless suffering, and a lingering death. These alternative procedures include, but are not limited to, procedures that remedy the deficiencies described above.  There was a substantial risk that use of the procedures set out in the Field Memorandum to execute Clayton produce severe pain, needless suffering, and a lingering death. This risk is illustrated by the severe pain, needless suffering, and lingering death inflicted by the Defendants as they purportedly used those procedures in Clayton Lockett.

101.  In adopting and implementing the procedures set out in the Field Memorandum, and in carrying out the torture killing of Clayton Lockett with those procedures, the Defendants Patton and Trammell have acted with deliberate indifference

to the constitutional rights of Clayton Lockett.

102.  These defendants had a constitutional obligation to adequately train and supervise their subordinates to insure that they did not torture Clayton Lockett to death. They needed to insure that adequate drugs would be used for a relatively quick and painless death, and that they staff was trained on procedures if things started to go wrong. They failed to perform their constitutionally mandated obligations to train and supervise.

**Claim Six - Failure to Protect State-Created Rights**
**Procedural Due Process Violation – 14th Amendment**
**(All Defendants)**

103.   All Statements of fact contained in this Complaint are hereby incorporated into this paragraph as though set forth fully herein.

104.  Prior to November 1, 2011, an Oklahoma statute, 22 O.S. § 1014(A), required that the sentence of death be carried out by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic drug. This method has never, on its face, been held unconstitutional by any appellate court of competent jurisdiction. Clayton Lockett was sentenced while this statute was in effect.  He had a liberty interest in being executed by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic drug.

105.  The statute identified above was amended, effective November 1, 2011, to require that the punishment of death be carried out by administration of a lethal quantity of a drug or drugs. The amended statute imposes no requirement that any of the drugs be an ultra short-acting barbiturate.

106.  An ultra short-acting barbiturate can induce and maintain anesthesia more

26

quickly and effectively than other chemical agents, such as those used by the Defendants in their attempted execution of Clayton Lockett. These characteristics assure that an individual will swiftly lose awareness and remain unaware as other agents that produce severe pain are administered to produce death.

107.  The statute described above gave Clayton Lockett the protected right to be executed by administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic drug. This right represents an interest in life and liberty protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

108.  The Defendants are aware of the right, yet they tortured Clayton Lockett to death without using an ultrashort-acting barbiturate, in disregard of that right.

<b>Seventh Claim For Relief<br>
Sixth Amendment Right to Counsel and<br>
First Amendment Access to the Court Violation<br>
(Defendants Patton and Trammel)</b>

109.   Clayton Lockett had a right to petition the government and the courts, guaranteed by the First and Fourteenth Amendments to the United States Constitution. This right continues to exist during every stage of any attempt to execute that Plaintiff.

110.  Up through the time of his torture Killing, Clayton Lockett was represented by counsel.  He had a right to consult with and be represented by his counsel before the government and the courts, guaranteed by 18 U.S.C. § 3599 and the Fourteenth Amendment to the United States Constitution. This right continued to exist during every stage of any attempt to execute him.

111.  The right to counsel and the right to petition the government and courts afford the only mechanism whereby Clayton Lockett could challenge violations of the

27

Eighth and Fourteenth Amendment that may occur as any attempted execution proceeds. These rights also afford the sole mechanism for remedying deviations from the procedures set out in the Field Memorandum as an execution takes place.

112.  The risk of violations and deviations of the type described in this Complaint is substantial, as evidenced by the severe pain, needless suffering, and lingering death inflicted on Clayton Lockett.

113.  The denial and interference with the right to counsel and the right to access the courts was effected in part by the Field Memorandum, which prohibits a condemned individual from communicating with his counsel, either in person or by telephone, at any time after 4:30 p.m. on the day set for his execution.

114.  The steps undertaken to kill Clayton Lockett, including insertion and maintenance of intravenous catheters, began only after communication with counsel was cut off.  In order to effectively represent Clayton Lockett before the government and the courts, counsel must be able to communicate confidentially with their clients during the steps of any attempted execution. The denial and interference described above prevented Clayton Lockett from seeking redress from the courts during his horrific torture killing by denying counsel the ability to observe critical stages of the execution process as an outside witness.

115.  An Oklahoma statute, 22 O.S. § 1015 (b), directs the Defendants Patton and Trammell to allow each execution be observed by outside witnesses. These witnesses may include counsel for the condemned person.

116.  Notwithstanding the statute identified above, the Defendants Patton and Trammell used blinds and soundproof barriers to block outside witnesses, including

Clayton Lockett's counsel from seeing and hearing critical stages of the execution process. Counsel was blocked from seeing and hearing such critical stages as insertion and maintenance of intravenous catheters, proceedings after an attempted execution is called off, and death.

117.  Clayton Lockett died behind a curtain, shielded from public view and more importantly, shielded from his counsel's view.

118.  In order to effectively represent their clients before government and the courts, counsel must be able to observe all steps of any attempted execution.  During the torture killing of Clayton Lockett, the Defendants Patton and Trammell intentionally denied outside witnesses, including counsel for Clayton Lockett, audiovisual access to such critical stages as insertion and maintenance of intravenous catheters, proceedings after his attempted execution was called off by Director Patton under authority granted by the governor.

119.  The Defendants Patton and Trammell knew that Clayton Lockett was represented by counsel, and knew that Clayton Lockett wanted to maintain access to his counsel during each step of the execution process. The Defendants Patton and Trammell also knew that Clayton Lockett would have wanted his  counsel to petition the government and the courts, should violations or deviations of the type described in this Complaint take place.

120.  Denying Clayton Lockett access to counsel and the courts was to deny his rights under the First, Sixth and Fourteenth Amendments to the United States Constitution and under 18 U.S.C. § 3599.

**Relief Requested**

WHEREFORE, Plaintiff respectfully request the following relief:

A.      That judgment enter against these defendants and that damages be awarded for the physical and psychological suffering inflicted upon Clayton Lockett by the Defendants:

      a.   using the drugs and procedures employed in the attempt to kill Clayton Lockett, or similarly untried, untested and unsound drugs and procedures;

      b.   using midazolam;

      c.   using compounded drugs;

      d.   using any of the types of unsound procedures and inadequately trained personnel identified above;

      e.   using drugs that do not include an ultra short-acting barbiturate;

      f.   in the course of human experimentation with drugs and procedures of scientifically unproven efficacy in avoiding severe pain, needless suffering and a lingering death;

      g.   while Clayton Lockett's  access to counsel was subject to interference or denial.

B.      That a declaratory judgment be awarded declaring that Clayton Lockett's rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated:

      a.   using the drugs and procedures employed in the torture killing of Clayton Lockett;

      b.   using midazolam;

    c.  using compounded drugs;

    d.  using the types of unsound procedures and inadequately trained personnel identified above;

    e.  using drugs that do not include an ultra short-acting barbiturate;

    f.  in the course of human experimentation with drugs and procedures of scientifically unproven efficacy in avoiding severe pain, needless suffering and a lingering death;

    g.  while Clayton Lockett's access to counsel was subject to interference or denial.

C.    An award of attorney fees and costs.

D.    Such other relief to which the Plaintiffs may be entitled.

**PLAINTIFF DEMANDS A JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 13th day of October, 2014.

Respectfully submitted,

_s/ David A. Lane_
David A. Lane (CO Bar #16422)
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com

_s/ Kathryn Stimson_
Kathryn Stimson (CO Bar #36783)
THE LAW OFFICE OF
KATHRYN J. STIMSON
1544 Race Street
Denver, CO 80206
(720) 638-1487
kathryn@stimsondefense.com

*s/ Mark Henricksen*
Mark Henricksen
HENRICKSEN & HENRICKSEN
LAWYERS, INC.
600 North Walker, Suite 201
Oklahoma City, Oklahoma  73102